BEER, Judge.
This is a tort suit. The jury returned a 10-2 verdict in favor of the plaintiff in the amount of $400,000. Appellants have limited their suspensive appeal to the quantum issue.
Eric Monette was 23 years old at the time of the accident (August 12,1976). He testified that he was working from a crane basket when an explosion occurred. He jumped from the basket to the ground, injuring his left heel and back. He was examined at Chalmette General Hospital and released that same evening.
On the following day, Dr. Henry J. Zac-kin, a general surgeon, diagnosed Monette’s injuries as a sprained left ankle, possible fracture of the left heel, abrasion of the right pretibial area, ringing in the left ear and low back muscle strain. By August 30 (approximately 2½ weeks later), Dr. Zackin advised Monette to discontinue use of the back brace he had prescribed after his initial examination and, by September 9, to discontinue the use of the walking cane also previously prescribed. Dr. Zackin discharged Monette for full duty as of October 21, at the time observing that it would take some time for the residual discomfort of the back strain to completely subside.
While still under Dr. Zackin’s care, Mon-ette was also seen by Dr. Gernon Brown, an orthopedic surgeon. Dr. Brown’s examinations revealed no objective evidence of disc pathology or disability. His opinion was based on four orthopedic examinations.[1] He believed that Monette could return to full time employment at his usual job without limitation. (R., pp. 813-818.) At the trial, he discounted the reliability of x-rays taken by Dr. Alain Cracco because of exposure and location problems. (R., pp. 823-825.) He read the myelogram performed by Dr. Cracco as normal (R., p. 835), pointing out certain technical problems of interpretation. (R., p. 856.)
On October 29, 1976, Monette was first examined by Dr. Cracco, an orthopedic surgeon, who testified that all test results conducted at that time were negative for disc injury but indicated that he had noted disturbed lumbopelvic rhythm which he described as slight hesitation upon bending to touch toes. (R., pp. 275-276.) On the same date, x-rays were taken which, in his opinion, revealed some disfunction of the 4th and 5th vertebrae upon bending to the left. (R., p. 284.) He recommended physical therapy. Improvement was noted on November 24. By December 14, symptoms were essentially non-existent, but the x-rays did, nevertheless (in his opinion), confirm “non-participation” of the L4-5 discs on lateral bending to the left. An electro-myograph was believed by Dr. Cracco to indicate chronic “denervation” involving the L-A nerve root.
Then, on January 6,1977, Dr. Cracco suggested that Monette perform no work for ten days and, thereafter, return to light *730 duty. On January 26, 1977, Monette complained to Dr. Cracco of sudden onset of low back pain while mopping. Dr. Cracco recommended no more mopping. (R., pp. 302-303.) He released Monette for light duty on February 5. He saw Monette on five more visits that year. (R., p. 318.) His findings on these occasions were essentially normal (R., p. 346), but light duty was, nevertheless, recommended. (R., p. 317.) Then, on February 22, 1978, Monette complained of back pain after digging a hole (R., p. 318). Dr. Cracco recommended a myelogram which was performed on February 27, 1978. Dr. Cracco thereafter interpreted the myelogram as showing a filling defect at L4-L5 and L5-S1 (R., p. 322). In his opinion, a venogram (which was taken at the same time by Dr. Fortenberry) indicated a “pressure defect” at L-4 on the left side. (R., p. 323.)
On cross-examination, Dr. Cracco acknowledged that as early as December 15, 1976, plaintiff did not demonstrate disturbance of the lumbopelvic rhythm. He further acknowledged that his report of March 18,1977 referred only to “indirect” evidence of disc disease (R., p. 339); that his report of June 21, 1977 recommends that Monette resume his full work activity (R., p. 341); and that his report of July 5, 1977 indicated that there were no contraindications to Monette’s resuming full work activity. (R., p. 342.) Dr. Cracco could not estimate any percentage of disability attributable to Monette’s August 12, 1976 injury; however, he felt that Monette should try to avoid heavy labor.
On December 7,1977, Monette was examined by Dr. Essom Elmorshidy, an orthopedic surgeon. Dr. Elmorshidy found spasm of the paraspinal muscles and straight leg raising was diminished. (R., p. 723.) He diagnosed a lumbrosacral sprain, and prescribed rest and muscle relaxants, estimating a one-week disability. (R., p. 724 and 726.) His December 13 examination revealed lessened spasm (R., p. 727), and he recommended that Monette return to work. (R., p. 727.)
Dr. Eugene Dabezies, who was qualified as an expert in the field of orthopedic surgery and herniated disc disease, examined Monette on November 2, 1976 and found the examination to be normal. (R., p. 767 and 769.) None of the x-rays taken by Dr. Dabezies indicated any abnormality. (R., p. 768 and 769.) However, his examination of the previously discussed myelogram indicated an abnormal disc. (R., pp. 780-781.)
Dr. Richard Levy, an expert in the field of neurosurgery, examined Monette on April 13, 1978 and found no evidence of spinal cord or nerve root injury or disease. (R., p. 882.) In his opinion, the previously discussed myelogram was normal. (R., p. 885 and 894.) He believes that Monette should be fully able to continue working without problems. (R., p. 896.)
Dr. Lowell Hurwitz, an expert radiologist, interpreted the myelogram as positive at L4-5 and L5-S1. (R., p. 925.) He explained that his function is to give an impression which serves as an aid to the treating physician, although Dr. Levy had challenged the capability of a radiologist to render a medical opinion regarding the my-elogram.
Grenes Meyoski, president of O.C.A.W. Local 4-522, testified regarding the basic hourly wage rate for a laborer at Tenneco, and Dr. Seymour S. Goodman, an economist, calculated Monette’s alleged loss of earning capacity by applying the following factors: 36.7 years work life expectancy, 5⅞% discount, 7.07% wage increase, and overtime hours at time and a half. He concluded that by using the undiscounted minimum wage at the 1981 rate, Monette’s work life income would be $256,709.16. (R., p. 704.) There was extensive testimony on the effects of inflation. Dr. Goodman acknowledged that he had neither verified the wage figures given to him by plaintiff’s attorney nor the overtime hours used in his calculation.
Monette claims that he last worked on a full time basis in February, 1978, and that he can no longer perform any type of labor because of his back. (R., p. 471.) He stated that the venogram and myelogram were very painful. (R., p. 473.) Two separate automobile accidents (in 1973 and 1975) resulted in no back involvement. (R., pp. 467-468), which is why he did not report *731 either of these accidents to any of the physicians who saw him. (R., pp. 467-468.) He is a high school graduate and has been previously employed as bricklayer, a hospital orderly, an apprentice pipe fitting plumber and also as a worker for United Parcel Service. (R., pp. 437-439.)
The jury’s lump sum award of $400,000 represents an abuse of their much discretion. Accordingly, following Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and its progeny, including the most recent pronouncement by our brothers of the First Circuit in Parker, et al. v. Travelers Insurance Company, et al., Number 12,-430, consolidated with Pellegrin, et al. v. Travelers Insurance Company, et al., Number 12,431, handed down March 5, 1979, 369 So.2d 1120 (La.App.) we limit our modification so as to decrease the award only to an amount that is the maximum which would not have constituted such abuse and, accordingly, set the award at $85,000. Thus amended, the judgment js affirmed. Each party is to bear its own costs of this appeal.

AMENDED AND, AS AMENDED, AFFIRMED.

. September 30, 1976; October 27, 1976; March 4, 1977; March 29, 1977.